IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

D.H.,                                          :
                                               :
    Plaintiff,                             :
                                               :        CIVIL ACTION FILE NO.
    v.                                     :        1:22-cv-03419-JPB
                                               :
TUCKER INN INCORPORATED                        :
d/b/a SUPER 8 BY WYNDHAM,                       :
                                               :
    Defendant.                             :
                                               :

---

## PLAINTIFF'S BRIEF IN SUPPORT OF RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Patrick J. McDonough
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
Jonathan S. Tonge
Georgia Bar No. 303999
jtonge@atclawfirm.com
*Attorneys for Plaintiff*

Andersen, Tate & Carr, P.C.
One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile

## INTRODUCTION

Fifteen-year-old D.H. was trafficked for sex at the Super 8 for eight days—sold for sex at the small, 50-room hotel roughly 140 times—before being rescued by the police in a reverse sting. Her trafficker, her older sister, was arrested, as were two buyers, one of whom went to trial and was convicted of statutory rape.

The Super 8 was, and is, notorious for sex trafficking, prostitution, drugs, and violent crimes, like shootings and gang murders so violent the victim is left unrecognizable as a man or a woman. In prior testimony, Umesh Patel, the hotel's manager and part owner of Defendant, was shown a news report of a "serial rapist" named Terique Hall who contacted prostitutes and sex trafficking victims off of Backpage and raped and gruesomely murdered them. Hall attempted to rape a prostitute at the Super 8.[1] The victim's pimp, also at the Super 8, heard the rape victim's[2] screams and shot at Hall's car as he fled the hotel. In another incident discussed in the article, Hall raped and killed a 20-year-old pregnant woman. He hog-tied the woman with zip ties and then tried to videotape himself suffocating her.[3] Ex. 1 at 4.

---

[1] By then, the hotel had changed names to an Americas Best Value Inn, but the ownership and operation of the hotel remained the same. To avoid confusion, Plaintiff will refer to the hotel at all times as the "Super 8."

[2] Almost certainly a sex trafficking victim given the pimp's violent involvement.

[3] Ex. 1, News Articles, Sharpe, Joshua, *'Serial rapist' tried to film murder of Dekalb woman, official says,* Atlanta Journal-Constitution, (Dec. 14, 2016).

When asked about these incidents, Mr. Patel testified, "***Incidents like this happens [sic] all the time. It's a hotel and this is part of the routine***." Ex. 2, Patel Felder Dep. 180:8–181:4.[4]

Fifteen-year-old D.H. was another victim of the "routine" at the Super 8. Police investigators said she was younger and younger looking than the other girls in that area. During her trafficking, D.H. had a conversation with a Super 8 employee. Defendant seizes upon this conversation and mischaracterizes it as the lone evidence Defendant should have known about D.H.'s trafficking at the hotel.[5]

That argument is false, and also improperly removes all context—the "totality of circumstances—of the hotel's illegal activities. Multiple witnesses have testified the Super 8 rented rooms for commercial sex by the half hour or hour, waited to take payment from girls being sold for sex or drug dealers until they raised money by selling sex or drugs at the hotel each day, and actually hired two sex trafficking victims to work at the hotel *at the direction of their sex trafficker.*

But even setting aside the mountains of evidence of violent sex trafficking and

---

[4] Prior testimony by the hotel and its employees comes from the case *Eric Felder v. Tucker Inn Incorporated, et al.*, Case No. 18A68028 (Dekalb Cnty. State Court). The deposition of Umesh Patel from that case are referred to as their "Felder" depositions herein.

[5] Even were that true—and it is not—that conversation (and the context around it—the lingerie that only covered the 15-year-old's nipples, her conduct, injuries, and behavior) *would* be enough to create a jury question as to whether the hotel knew or should have known of D.H.'s trafficking there.

crime at the hotel, just as to D.H., this is what the hotel should have seen and known:

- D.H. was sold to roughly *twenty* men per day at the Super 8. That means the 15-year-old was sold for sex at the Super 8 about 140 times in one week at the Super 8. Each of the roughly 140 times a man came to the Super 8 to buy sex with the very young-looking minor—twenty times a day—D.H. stood outside her room, by the back stairs, in full view of the security cameras and any employees outside, and escorted different men to her room, who left a short while later. Ex. 3, D.H. testimony, Brown Trial Transcript Vol. 2 35:2–16; Ex. 4, D.H. Dep. 187:23–188:10; 174:16–175:8; 268:23–25; Ex. 5, Def. 30(b)(6) 101:7–9.
- On 5–10 occasions, while she was standing outside at the hotel, Defendant should have seen the 15-year-old outside near the stairwells, when she repeatedly saw people having sex in the outdoor stairwells. Ex. 4, D.H. Dep. 190:18–191:6.
- The rooms in which D.H. was trafficked had even more foot traffic than that, as two of her sisters were also selling sex during the day. *Id*. at 184:20–25; 186:5–11.
- D.H. was kept in two rooms in the back corner of the hotel, which had security cameras on each corner. Ex. 3, Santresia Woods testimony, Brown Trial Transcript Vol. 2 106:3–9; Ex. 5, Def. 30(b)(6) 29:5–12; 101:7–9; 113:15–24.
- D.H. was a very young looking girl. Ex. 4, D.H. Dep. 182:4–7; Ex. 6, Det. Kennedy Test., Brown Trial Transcript Vol. 3 240:18–19; Ex. 3, Sgt. E. McCowan Test., Brown Trial Transcript Vol. 2 146:7–11. She and her sisters walked around the hotel to get food and cigarettes, which she smoked outside the room. Ex. 4, D.H. Dep. 182:4–7.
- D.H. dressed in lingerie outside at the hotel. *Id*. at 179:20–25–180:11.
- She and her sisters went to the front desk to ask for towels. *Id*. at 254:13–16.
- D.H. physically appeared sleep deprived around the hotel, owing to the fact that she was sold to men for sex at all hours of the day and night. Ex. 7, D.H. Dec. ¶ 3.
- D.H. was often beaten at the Super 8 by her trafficker. These beatings left her with visible injuries at the Super 8, including a busted lip, and scratches and bruises all over her body, which were very visible given the revealing lingerie tops she wore around the hotel. *Id*. at ¶ 4.
- D.H. kept her head down and acted depressed. Once she went into the front office with her sister to pay for the room that day and a hotel

3

> employee said, " . . . you look pretty young, like you look very young. D.H. said, I am young. The employee said, you look depressed. You walking around here with your head down. You look sad all the time. D.H. told her, I am sad." Ex. 4, D.H. Dep. 177:18–178:25.
> - During this conversation in the office, the 15-year-old was wearing a lingerie top that covered only her nipples. *Id.* at 179:20–25; 180:5–7

This is precisely the kind of activity Defendant admitted in its deposition that it looks for and can see as a sign of prostitution, something the hotel can discern "within one or two days, we can find out." Ex. 5, Def. 30(b)(6) 69:11–70:2. And of course, observing a 15-year-old involved in "prostitution" is observing sex trafficking, whether Defendant knows it or not.

Defendant's motion is like its testimony; a textbook demonstration of deliberate ignorance.[6] On one hand, Defendant states it looks to traffic in a room to root out prostitution, but on the other hand, Defendant has testified that not once in the more than 20 years it has owned the hotel has it *ever even suspected* someone of engaging in prostitution at the hotel. *Id*. at 72:12–16. Given the multiple attempted murders of prostitutes at its hotel, the reviews the hotel admits it read, the numerous

---

[6] Proving knowledge in a TVPRA case may be done by proving actual knowledge, or deliberate ignorance. *Does 1-4 v. Red Roof Inns, Inc.*, 1:21-CV-04278-WMR, 2023 WL 5444261, at *3 (N.D. Ga. Aug. 10, 2023) ("[I]f a party has his suspicions aroused but then deliberately omits to make further enquiries, because he wishes to remain in ignorance, he is deemed to have knowledge. And to prove either actual knowledge or deliberate ignorance, Plaintiff may rely on both direct evidence and circumstantial evidence based on the "totality" of circumstances.") (inner citations omitted); *W.K. v. Red Roof Inns, Inc.*, 1:20-CV-05263-VMC, 2023 WL 6290523, at *10 (N.D. Ga. Sept. 14, 2023) (same).

police reports and the shocking testimony of numerous witnesses in this case, it is for the jury to determine what Defendant *should have* known about the money it made from D.H.'s trafficking.

## I.    STATEMENT OF FACTS

When she was 15-years-old, from September 2–9, 2015, D.H., was trafficked for sex at Defendant's Super 8 hotel by her older sister. Ex. 3, D.H. testimony, Brown Trial Transcript Vol. 2 at 26:4–16; Ex. 4, D.H. Dep. 78:9–18; 185:15–18; 196:25–197:4. D.H. was sold to about twenty men per day at the Super 8. Ex. 4, D.H. Dep. 268:23–25. When these buyers came—roughly 140 of them in that week—D.H., who looked very young, waited by the outdoor stairwell to escort these men to her room. *Id*. at 178:3–25; 187:23–188:10; 268:23–25; Ex. 8, Gibbs Dep. 64:2–65:22. She frequently wore lingerie outside and around the hotel. Ex. 4, D.H. Dep. 179:20–25; 180:1–11. She was constantly under the control and eye of her trafficker and walked around the hotel with her head down, looking depressed. *Id*. at 120:6–8; 177:18–178:25. She appeared sleep deprived from having to meet men buying her for sex at all hours. Ex. 7, D.H. Dec. ¶ 3. She was often beaten by her trafficker at the Super 8 and her busted lip, and scratches and bruises all over her body were visible, particularly because of the revealing lingerie tops she wore at the hotel. Ex. 7, D.H. Dec. ¶ 4. Once, while wearing a lingerie top that covered only her nipples, she spoke with a hotel employee while her trafficker was paying for the room that

day. Ex. 4, D.H. Dep. 177:18–178:25; 180:1–11. The employee told her, " . . . you look pretty young, like you look very young. D.H. said, I am young. The employee said, you look depressed. You walking around here with your head down. You look sad all the time. D.H. told her, I am sad." Ex. 4, D.H. Dep. 177:18–178:25. The employee did nothing to help D.H. after this conversation. *Id.*

On September 9, D.H. was rescued from the hotel when police conducted a sting operation. Ex. 9, D.H. Police Report. Her trafficker was arrested as were two buyers, one of whom was convicted following a jury trial in which D.H. and Mr. Patel testified. *Id.*; Ex. 10, Frank Brown Sentence.

### A.    Commercial sex was allowed at Defendant's hotel.

The Super 8 has a long and sordid history of commercial sex, sex trafficking, drugs, gangs, and violent crime. In fact, this history is simply too much to recount here. The Court is familiar with some of this evidence from its denial of Defendant's motion to dismiss, Doc. No. 83. The complaint's allegations have been exceeded and proven, by six different eyewitnesses to commercial sex, twenty police investigations and arrests just for sex-related crimes at the hotel prior to D.H.'s trafficking,[7] and the nine online reviews reporting safety concerns and sex crimes, which Defendant confirmed it read. Ex. 11, Online Reviews; Ex. 12, Incident

---

[7] This includes six men who were arrested in the Super 8 parking lot for pandering and soliciting sex from an undercover police officer on May 7 2015, just four months before D.H. was trafficked there.

6

Reports; Ex. 2, Patel Felder Dep. 79:15–80:2, 84:14–19; Ex. 5, Def. 30(b)(6) 159:4–11. Other specific incidents at the hotel include the 'serial rapist' and murderer noted above, *supra* 1–2, and a gang initiation murder in 2012 of a man who "was so badly mutilated that the paramedics could not determine his sex or race."[8] Ex. 1, at 7.

*Six different witnesses*, unknown to each other, corroborate this disturbing picture, and they all testified that the commercial sex activity was routinely concentrated on the back side of the hotel. Ex. 13, D.S. Dep. 23:6–27:16; Ex. 14, J.J. Dec., ¶¶ 3–10; Ex. 15, Lively Dec. ¶¶ 2–11; Ex. 16, E.M. Dep. 147:10–12; Ex.17, Williams Dep. 15:24–16:9; 22:7–21.

D.S.[9] testified that she engaged in prostitution at the Super 8 for a decade—**from 2012 through December 2022**. Ex. 13, D.S. Dep. 18:20–19:13. She stayed at the hotel over 500 times. *Id*. When D.S. first came to the hotel, drug dealers and prostitutes told her not to call the police at the hotel, but instead to inform the owner, Mr. Patel, of any problems, saying, "Mr. Patel, he doesn't like for you to call the police."[10] *Id*. at 43:18–44:13.

---

[8] Ex. 1, Boone, Christian, '*Dekalb Gang Member Sentenced to Life,'* Atlanta Journal-Constitution, (Sept. 25, 2015).

[9] D.S. and other witnesses identified their initials herein have been identified as sex trafficking victims and their depositions will be filed under seal in accordance with the protective order in this case.

[10] This evidence is not hearsay because it is evidence concerning Mr. Patel's character among his associates at the hotel. Fed. R. Evid. 803(21). Ex. 13, D.S.

D.S. saw roughly 20 other girls each day who were engaged in commercial sex at the hotel as well as "drug dealers, pimps, the people who would come and look for girls or drugs." *Id*. at 19:21–20:16. D.S. said the back side of the motel (where D.H. was trafficked) was where the illegal activity was concentrated. *Id*. at 23:6—27:16. She said, "There will be sexual activity back here in this corner on this side of the building where steps are. You would come out, you would see condom wrappers and crack pipes and everything like that. . . . I've heard myself sexual activities on the steps back there." *Id*. ***Approximately half of the motel's 50 rooms were occupied with commercial sex activity.*** *Id*. at 28:7–20. D.S. saw pimps interacting with victims, including hearing a pimp beat a victim to keep her from leaving the hotel, which ***she reported to hotel staff***. *Id*. at 33:7–34:14.

D.S. was at the hotel when a man believed to be an off-duty police officer raped another girl engaged in commercial sex there and she called the police to report the crime. *Id*. at 38:24–43:2. D.S. saw girls standing around the hotel, wrapped in towels in front of their doors, leaning over the balcony, or otherwise openly advertising themselves for sex to men who drove through the parking lot of the Super

---

Dep. 43–44. In fact, it is undisputed that the hotel has never once called the police because someone was engaging in prostitution. Ex. 5, Def. 30(b)(6) 73:6–8. The statement is also admissible as a co-conspirator statement under Fed. R. Evid. 801(d)(2)(E). And finally, it is also admissible not for the truth of the matter, but to show the effect on the listener and her conduct, i.e., why D.S. continued to sell sex at the hotel and would not have called the police there.

8. *Id*. at 50:3–51:12.

Mr. Patel allowed women being sold for sex to pay less rent than men selling drugs at the hotel. *Id*. at 84:13–93:2. D.S. heard Mr. Patel arrange with guests to pay for their rooms late, until after they made money from illegal activity like selling drugs or selling sex. *Id*. This was a common occurrence. Ex. 13, D.S. Dep. 87:18–88:21. D.S. saw and heard conversations between Mr. Patel and other guests telling him that they would have his rent money soon because, "I've got a play on the way." *Id*. at 84:13–93:2.[11] This was frequently-used lingo that Mr. Patel understood. *Id*. Mr. Patel would respond, "Okay. Okay, man. I got you. I know, man. Just come back, man." *Id*. at 90:10–11.

*Before*[12] D.H. was trafficked at the Super 8, Tonya Harris lived at the hotel in 2014 with her two children. Ex. 18, Tonya Harris Dep. 16:5–8; 17:5–7. She saw

---

[11] A "play" is a "john" or person who buys commercial sex from a victim. Ex. 4, D.H. Dep. 112:4–10.

[12] Plaintiff distinguishes here between incidents occurring *before* D.H.'s trafficking and incidents occurring *after* D.H.'s trafficking. In a related case involving the same hotel, Judge William Ray held in a telephone conference that such after evidence could be admissible impeachment evidence given the hotel's blanket denial that it has never seen anything that made it suspect someone at the hotel of engaging in prostitution. *See E.M. v. Tucker Inn, Inc.*, Case No. 1:22-cv-02559-WMR, Doc. No. 81. This "after evidence" is relevant to impeach, and to show the Defendant's involvement in sex trafficking and its pattern and practices of allowing and facilitating sex trafficking. It is also relevant evidence in Plaintiff's nuisance claim, which requires continuity and repetition. *City of Atlanta v. McCrary*, 328 Ga. App. 746 (2014) (" . . . the continuity and repetition necessary for a finding of nuisance . . . ") (J. Ray).

9

obvious commercial sex, men driving up to visit rooms, and scantily dressed girls. *Id*. at 18:3–19; 19:13–15; 26:6–11. She saw men she believed were pimps with girls at the hotel who called their girls "bitches" when loitering there. *Id*. at 22:18–24:5. This activity was obvious and apparent to anyone observing the parking lot and ***Ms. Harris reported this activity to multiple staff members***, who did nothing. *Id*. at 28:2–6; 28:14–29:5; 35:17–37:13. She said, "there's no way that you could not have seen what was going on. You may not say anything about it, but it was still obvious." *Id*. at 28:14–29:5.

While D.H. was trafficked, she saw older women and girls that looked like they were around her age of 15 years old being sold for sex, walking around the motel in skimpy clothes, men coming to the motel for short stays "all day, all night." Ex. 4, D.H. Dep. 124:25–125:11; 166:15–18; 173:15–174:15; 191:12–19. She called it a "whore hotel." *Id*. at 166:15–18. D.H., like D.S., saw people having sex in the outdoor stairwell more than five times in the 8 days she was at the hotel. *Id*. at 170:7–14; 190:18–191:6. D.H. met another victim of sex trafficking at the hotel who was being trafficked by a man there. *Id*. at 175:19–177:17; 188:23–189:23. D.H. heard the girl screaming for help through the walls of the hotel when she was being pistol whipped. *Id*. at 175:19–177:17; 188:23–189:23.

Erin Gibbs, Dekalb County investigator with the Internet Crimes Against Children Unit, patrolled and investigated the Super 8 and the surrounding area for

years, from 2011–2017. Ex. 8, Gibbs Dep. 15:18–24; 17:24–18:2; 20:4–21:24; 38:19–22; 81:7–82:11. The area was known for prostitution, drugs, and gang activity. *Id.* at 15:18–24; 17:24–18:2; 20:3–21:24; 38:19–22. Officer Gibbs investigated and determined that D.H. was a victim of minor sex trafficking at the Super 8, saying, "she looked young. I remember her demeanor, that she was, like, new to it . . . that this was her, like, first experience in this type of activity . . . I remember thinking she had a baby face." *Id.* at 64:2–65:22; 67:14–17. In Gibbs' experience, more than 90 percent of people engaged in selling commercial sex are actually being sex trafficked by someone else and "an active commercial sex operation at a hotel is the biggest single red flag for sex trafficking." Ex. 19, Gibbs Dec. ¶ 8.

Evidence that this activity continued on for years—impeaching the hotel's blanket know-nothing denials—is significant. J.J. was a victim in 2016 who was beaten by her trafficker daily at the hotel. Ex. 14, J.J. Dec., ¶¶ 2–4. She saw girls and women being sold for sex all over the property, saying, "Some of the girls truly looked like little girls or early teens made up to look like whores." *Id.* at ¶ 5. Employees of the motel, including the manager, knew the traffickers operating at the motel well. *Id.* at ¶ 7. The manager knew J.J.'s trafficker so well that when the sex trafficker told the manager to hire J.J. as a housekeeper, the manager did that until the trafficker told her to stop. *Id.* This also happened with the other victim J.J. was

trafficked with. *Id*. When they were short on money, the motel would let them pay for their rooms late, after making money from being sold for sex at the Super 8. *Id*. at ¶ 8.

Chelsea Lively witnessed rampant trafficking at the Super 8 in 2016, seeing eight or more other girls being sold for sex and the girl in the room next to her with a pimp seeing more than 10 dates per day. Ex.15, Lively Dec., ¶¶ 2–10. E.M.[13] was another minor victim of sex trafficking at the motel who, in 2017, was rescued by police. Ex. 8, Gibbs Dep. 50:25–-61:21; Ex. 16, E.M. Dep. 105:5; 220:14–24; 147:24; 161:2–24; 247:19–5; Ex. 20, E.M. Police Report.

Vera Williams was a prostitute at the Super 8 who was stabbed by another prostitute at the hotel during a fight over a buyer. Ex. 17, Williams Dep. 15:24–16:9. She was stabbed numerous times, ran naked and bleeding around the motel, ***encountered an employee who did nothing***, and was then taken to the hospital. *Id*. at 16:6–17:20. Ms. Williams saw buyers frequently circle the parking lot of the motel, which had a single entrance and exit, selecting women standing outside to purchase for sex. *Id*. On average, she estimated that she saw 20 cars an hour pull through the motel looking to buy sex. *Id*. at 26:10–27:6. The motel allowed men to purchase rooms for an hour or half hour with Ms. Williams at all times of day,

---

[13] E.M. is the plaintiff in another case against Defendant, *E.M. v. Tucker Inn, Inc.*, Case No. 1:22-cv-02559-WMR.

12

requesting rooms at the back of the motel, and at times Ms. Williams saw other girls having sex with men in the cars in the parking lot of the motel, also in the back. *Id*. at 29:9–30:25; 41:1–3.

For its part, Defendant has testified that it had no safety or security policy to observe guest activities; that Mr. Patel, the manager for over a decade, has never received any kind of safety or security training; that despite having security cameras and agreeing staff *should* monitor them, no one at the hotel was tasked with monitoring cameras, and the hotel never told its staff to watch the monitors. Ex. 2, Patel Felder Dep. 59:6–18; 63:20–64:7; Ex. 5, Def. 30(b)(6) 101:24–102:18. Unsurprisingly, the hotel has no idea how to identify prostitution, pimps, or sex trafficking. Ex. 5, Def. 30(b)(6) 73:9–18; 76:2–4; 76:9–19; 77:7–13. Mr. Patel knew the police conducted prostitution and drug stings at the motel prior to D.H.'s trafficking and the police called multiple meetings of the owners of the Super 8 and the surrounding hotels specifically to address the rampant prostitution and crime. Ex. 2, Patel Felder Dep. 93:8–98:24; 99:18–101:25. Mr. Patel read the online reviews every day and was aware of reviews about prostitution, drug dealing, and safety. Ex. 2, Patel Felder Dep. 79:15–80:2, 84:14–19; Ex. 5, Def. 30(b)(6) 159:4–11. Even so, the hotel testified that it has *never once* suspected a single person at the hotel of engaging in prostitution. Ex. 5, Def. 30(b)(6) 72:12–16.

## I.    SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), a court can only grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. A material fact is any fact that "is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). A genuine dispute exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Ultimately, "the basic issue before the court on a motion for summary judgment is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Allen*, 121 F.3d at 646 (quoting *Anderson*, 477 U.S. at 251).

## II.    ARGUMENT

### A.    The Court should deny Defendant's motion for summary judgment as to D.H.'s claim under the TVPRA.

#### i.    Defendant participated in a venture under the TVPRA.

Defendant does not dispute the first element of D.H.'s TVPRA claim.[14]  *See* Doc. No. 97-1 at 11, n. 3. The second element, participation in a venture, requires evidence from which a jury could determine that "Defendant rented rooms to D.H.'s

---

[14] Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1591, *et seq.*

14

trafficker and that Defendant knew or should have known that the trafficker was presently engaged in sex trafficking with Plaintiff." *D.H. v. Tucker Inn Inc.*, 1:22-CV-3419-JPB, 2023 WL 6538391, at *3 (N.D. Ga. Sept. 1, 2023). Mr. Patel testified in the trial of Frank Brown—one of D.H.'s buyers convicted of statutory rape—that the hotel rented rooms to D.H.'s trafficker. Ex. 3, Patel testimony, Brown Trial Transcript Vol. 2 at 133:10–136:5.

The hotel should have known the 15-year-old D.H. was being trafficked because of her young age and appearance, how she walked with her head down with her trafficker, her visible sleep deprivation, her busted lip, scratches and bruises from her trafficker's beatings, and her appearance around the hotel in lingerie, including speaking to a hotel employee while wearing lingerie that only covered her nipples. Ex. 4, D.H. Dep. 120:6–8; 178:3–25; 179:20–25; 180:1–11; 182:4–7; Ex. 7, D.H. Dec. ¶¶ 3, 4.

The hotel employee's own statements to D.H. is itself evidence that the hotel employee—and thus, the hotel—observed D.H. multiple times at the hotel. One simply doesn't say to another person, "You look sad ***all the time***," the first and only time one talks to a stranger. Ex. 4, D.H. Dep. 178:3–19. The jury is entitled to the inference that this employee observed D.H. looking sad at the hotel on multiple occasions. Otherwise, the employee's statement makes no sense.

Furthermore, what matters is what the hotel *should have* seen, not only what

it saw. The hotel admitted that staff *should* monitor the security cameras, but didn't. Ex. 2, Patel Felder Dep. 59:6–18. D.H.'s security expert agrees the hotel should have actively monitored the security cameras, and the coming and going of people on the property. Ex. 21, Atlas Report at 42, 43. Had the hotel monitored its small property, as a reasonable hotelier should,[15] it should have seen the 15-year-old D.H. walking the property in lingerie and would have seen her—*approximately 140 times in eight days*—waiting on the outdoor walkway for men to come up and be escorted to the young-looking girl's room for a short period, before repeating the pattern, *twenty times a day.* Ex. 4, D.H. Dep. 178:3–25; 179:20–25; 187:23–188:10; 268:23–25.

This is one of the many examples which gives the lie to Defendant's insistence that prostitution is different than sex trafficking and, therefore, should be viewed in isolation and removed from this case. Here, the conduct of a female meeting twenty different men per day outside her hotel room and escorting them to her room for short periods of time, could look a lot like prostitution. But the fact that the female is a 15-year-old girl means that conduct is *per se* sex trafficking. 18 U.S.C. § 1591(a). And if the hotel had "a reasonable opportunity to observe" D.H., it doesn't matter

---

[15] "Constructive knowledge, on the other hand, is that knowledge which "one using reasonable care or diligence should have." *Constructive Knowledge*, Black's Law Dictionary (11th ed. 2019). Thus, the [defendants] may be liable under the TVPRA if they have either actual or constructive knowledge that the venture in which they participated and from which they benefited violated the TVPRA as to the Does." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 725 (11th Cir. 2021).

whether it knew she was a child or not. *D.H. v. Tucker Inn Inc.*, 2023 WL 6538391 at *4. In sum, the hotel had the opportunity to observe D.H. being sold for sex approximately 140 times in a week. Ex. 4, D.H. Dep. 187:23–188:10; 268:23–25. Given her age, the hotel "should have known that the trafficker was presently engaged in sex trafficking with Plaintiff." *Id.* at *3.

Additionally, Officer Gibbs testified that in her experience investigating sex trafficking in the area and at the Super 8, ***ninety percent*** of commercial sex is not voluntary prostitution, but is instead sex trafficking. Ex. 19, Gibbs Dec. ¶ 11. To take D.S.'s ten years of observations at the Super 8 as an example, D.S. testified that there were usually twenty other girls engaged in commercial sex at the Super 8 each day. Ex. 13, D.S. Dep. 19:21–20:16. Thus, in Officer Gibbs' experience, eighteen of those twenty girls engaged in commercial sex at the Super 8 were sex trafficking victims, not "voluntary" prostitutes.

Finally, Defendant plays the tiresome game of taking the few pieces of evidence it admits exist and evaluating each one in isolation and, after doing so, finding that all of the evidence has been ruled out.[16] However, that is not the appropriate legal standard. To prove Defendant's actual knowledge or deliberate

---

[16] It also helps if reams of testimony of the hotel's conduct in assisting and facilitating sex trafficking at the Super 8 is ignored entirely, as it is in Defendant's brief, which doesn't even mention that D.S.'s testimony encompasses almost four years of illegal activity at the hotel prior to D.H.'s trafficking, nor the testimony of Officer Gibbs.

17

ignorance, "Plaintiff may rely on both direct evidence and circumstantial evidence based on the 'totality' of circumstances." *Does 1–4*, 2023 WL 5444261, at *3 (citing *United States v. Perez*, 698 F.2d 1168, 1171 (11th Cir. 1983)); *W.K.*, 2023 WL 6290523, at *10 (same).

Here, the totality of the circumstances is overwhelming. The Super 8 was a place where the risk of sex trafficking should spring quickly to mind given the police activity, online reviews, and shocking witness testimony spanning a decade at the hotel. Witness D.S. sold sex at the Super 8 for ten years and often heard Mr. Patel arrange to take late payments from those selling sex or drugs at the hotel. Ex. 13, D.S. Dep. 84:16–90:11. Tonya Harris reported the rampant commercial sex activity of girls and pimps at the hotel to multiple staff members who did nothing. Ex. 18, Tonya Harris Dep. 28:2–6; 28:14–29:5; 35:17–37:13. Officer Gibbs knew the hotel's reputation for commercial sex and investigated numerous sex trafficking cases at the Super 8. Ex.19, Gibbs Dec. ¶¶ 6, 7. She said, "If you allow the commercial sex to happen and think, okay, well, it's just adults doing what they want to do, then that's fine, you are creating a space for juveniles to then be victimized if it's a known area that you can do this." Ex. 8, Gibbs Dep. 106:14–21. And this is only the evidence prior to D.H.'s trafficking. As explained *supra*, n.13, there is significant evidence impeaching the hotel's deliberate ignorance defense.

Given the evidence above, there is at least a jury question as to whether

Defendant participated in a venture with D.H.'s trafficker.[17]

### ii.    Defendant's venture violated the TVPRA as to D.H.

As to the third element, there is evidence from which a jury could conclude "that the venture in which Defendant participated committed a crime against her." *D.H. v. Tucker Inn Inc.*, 2023 WL 6538391, at *4. To prove this element, D.H. must adduce evidence "she was a minor when she was forced to engage in commercial sex acts and that the Defendant had a reasonable opportunity to observe her on the premises." *Id.* (citing *United States v. Whyte*, 928 F.3d 1317, 1328 (11th Cir. 2019)).

D.H. has established she was 15 years old and sold for sex about 140 times during the course of a week at the Super 8. Ex. 4, D.H. Dep. 268:23–25. Ex. 3, D.H. testimony, Brown Trial Transcript Vol. 2 26:4–16. And as discussed above,

---

[17] Defendant's "continuous business relationship" analysis is flawed as well, but ultimately the distinction is unimportant. The continuous business relationship test is simply "one way" to show participation in a venture, not the only way. *J.G. v. Northbrook Indus., Inc.*, 619 F. Supp. 3d 1228, 1235 (N.D. Ga. 2022). But here, that test is met also. The test requires only evidence that "defendant[] rented rooms to people it knew or should have known were engaged in sex trafficking." *Id.* The folio for the room rental shows that D.H.'s trafficker paid cash each day for an additional day at the hotel. Ex. 22, Folio, exhibit 9, Frank Brown Trial. After the first day of the 15-year-old D.H. meeting 20 men per day outside her room, Defendant should have known it was renting the room to D.H.'s sex trafficker. However, each day, it chose to have subsequent "commercial dealings with the [operators], which the parties [reinstated] for profit." *W.K.*, 2023 WL 6290523 at * 10 (cleaned up; first modification in original) (quoting *Ricchio v. McLean*, 853 F.3d 553, 555 (1st Cir. 2017) (looking to "prior commercial dealings ... which the parties wished to reinstate for profit" as evidence of the hotel defendant's participation in a venture). Until the police put a stop to it by rescuing D.H., her trafficker and the hotel were in a continuous business relationship.

Defendant had the opportunity to observe D.H. around the hotel wearing lingerie, bruised and cut, sleep deprived, in her interactions with the hotel's employee who had obviously observed her more than once when she said D.H. "looked sad all the time," and while D.H. escorted the roughly 140 men into her room for short periods of time to be sold repeatedly for sex. Ex. 4, D.H. Dep. 178:3–19; 179:20–25; 187:23–188:10; 268:23–25; Ex. 7, D.H. Dec. ¶¶ 3–4.

This evidence is sufficient to create a jury question as to the third element of her TVPRA claim. *D.H. v. Tucker Inn Inc.*, 2023 WL 6538391, at *4; *see also J.G. v. Northbrook Indus., Inc.*, 619 F. Supp. 3d 1228, 1238 (N.D. Ga. 2022) ("Plaintiff was sex trafficked as a minor and was caused to engage in commercial sex acts with dozens of adult men from 2018 to 2019. As a result, Plaintiff has satisfied the third element of her TVPRA beneficiary claim.").

### ii. Defendant knew or should have known its venture violated the TVPRA as to D.H.

The is sufficient evidence from which a jury could conclude Defendant had actual knowledge, or remained deliberately ignorant, as to D.H.'s minor sex trafficking at its hotel. In the motion to dismiss *in this case*, the Court made clear that the following allegations stated a claim on this element:

> Plaintiff's age and inappropriate appearance, her fatigue and sleep deprivation, her injuries, her failure to make eye contact with others, her loitering, her solicitation of male patrons and the number of men visiting her room.

20

*D.H. v. Tucker Inn Inc.*, 2023 WL 6538391, at *4. Thus, evidence *proving* those allegations likewise present a question for the jury.

Defendant did not ask D.H. in her deposition about her sleep deprivation or injuries. Thus, D.H. provides that evidence in her declaration. Having done so, there is evidence in this case of each of the bases for the Court's original analysis of this claim based on D.H.'s complaint. Defendant should have known about the venture which violated the TVPRA as to D.H. because of her age (15); her inappropriate appearance (wearing lingerie that only covered her nipples around the hotel); her sleep deprivation (due to being sold to men for sex at all hours of the day); her injuries (busted lip, scratches and bruises all over her body, more visible due to the revealing lingerie she wore); her failure to make eye contact (always walking with her head down); her loitering and solicitation and the number of men coming to her room (waiting on the outside walkway for roughly 140 different men to be escorted to her room to purchase the teen for sex). Ex. 4, D.H. Dep. 178:3–19; 179:20–25; 187:23–188:10; 268:23–25; Ex. 7, D.H. Dec. ¶¶ 3–4.

If this were all the evidence Defendant should have known about, it would be sufficient, just as the allegations of these facts were sufficient at the motion to dismiss stage. But of course, this is not nearly all the evidence the hotel should have been aware of. It should have been aware of all the evidence ignored in its motion, discussed at *supra* 5–14. It should have been aware of the rampant commercial sex

and pimps Tonya Harris reported to Defendant in 2014. Ex. 18, Tonya Harris Dep. 35:17–37:13. It should have been aware of the 20 sex crimes that police investigated on its property before D.H. was trafficked. Ex. 12, Incident Reports. It was aware of the reviews reporting prostitution at the hotel. Ex. 11, Online Reviews; Ex. 2, Patel Felder Dep. 79:15–80:2, 84:14–19; Ex. 5, Def. 30(b)(6) 159:4–11. It should have known that a 'serial rapist' and murderer attempting to rape a sex trafficking victim at its hotel is not "routine." Ex. 1, at 4–6; Ex. 2, Patel Felder Dep. 178:15–181:5. It should have known about the gang initiation murder of Robert Ross, which left him virtually unrecognizable as a human. Ex. 1, at 7. Defendant knew it rented rooms for commercial sex and allowed those persons to pay late after "working" at the hotel for their rent. Ex. 13, D.S. Dep. 84:16–90:11. Defendant knew it did not want its clientele calling the police about the illegal activity it housed. *Id.* at 43:18–44:13. As Officer Gibbs testified,

> "property managers, the staff who are there are going to be aware of what's going on, and even if they don't know that there is sex happening in the room, they know that this woman is here by herself, you know, where there's a number of people going in and out, or that this woman is here with a male subject who is – who is in and then out when the visitors come, because they're hiding somewhere else while the – while the acts happen. ***But the people who are on the property are going to know. They're going to know it's happening. It's that obvious. They're going to see the number of visitors that are – that are coming in and out.***"

Ex. 8, Gibbs Dep. 91:21–92:11.

Defendant knew or should have known about all the witness testimony

22

detailed *supra* at 5–14. Ignoring that evidence in its motion does not erase it from the record. The evidence above is more than sufficient to create a question for the jury about whether Defendant should have known about D.H.'s trafficking.

### B.    There is sufficient evidence supporting D.H.'s nuisance claim.

Defendant's argument that there is no evidence supporting a public nuisance is spurious. In fact, the statement to the Court that "there is certainly no evidence that staff had knowledge that the hotel was being operated for the purpose of sexually related charges" is outright false.

To restate just some of the evidence in this case, Defendant's manager, Mr. Patel, *knowingly*, and with control over the hotel's operations (1) asked prostitutes and drug dealers not to call the police to the hotel; (2) charged those involved in commercial sex a lower rate than those selling drugs; (3) allowed those involved in commercial sex to use its hotel rooms to sell sex *first*, then pay for that room once they had raised the money for the day from the commercial sex acts in the loaned hotel room; (4) rented rooms by the hour or half hour to men buying prostitutes who were standing around the parking lot of the hotel; (5) knew sex traffickers at the hotel well; and (6) hired two sex trafficking victims to work at the hotel *at the direction of their sex trafficker.*[18] Ex. 13, D.S. Dep. 43:18–44:13; 84:16–90:11; Ex.

---

[18] These facts are more than sufficient to create a jury question on punitive

17, Williams Dep. 29:9–30:25; 41:1–3; Ex. 14, J.J. Dec., ¶ 7.

Defendant makes more false statements about Plaintiff's complaint failing to allege that those who came in contact with the nuisance at the hotel were injured by it. Doc. No. 97-1 at 23–24. This is also untrue. *See* Doc. No. 1, ¶ 85 ("Everyone who came in contact with the sex trafficking at the hotel was harmed as a result.").

The truth is, a public nuisance is one which "encourages idleness, loitering, vagrancy and has a tendency to breed crime and debauch the morals of the community." *Chancey v. Hancock*, 233 Ga. 734, 734, 213 S.E.2d 633, 635 (1975). It is also *per se* nuisance to own, use, or maintain a building upon which "sexually related charges ***occurred***," or "were conducted, permitted, or carried on." O.C.G.A. § 41-3-1(b) (emphasis added).

D.H. has adduced evidence to back up her allegations of nuisance, which the Court previously found sufficiently stated a claim as to causation. *D.H. v. Tucker Inn Inc.*, 2023 WL 6538391 at *5 ("as this Court previously concluded, Plaintiff's Complaint adequately sets forth the reasons why Defendant should have been on notice of the rampant sex trafficking occurring at the Hotel and how it failed to prevent it."). The evidence of Mr. Patel's direct involvement in prostitution and sex trafficking above, as well as the totality of the evidence of illegal conduct at the

---

damages and attorneys' fees. These facts, and the facts *supra* at 5–14, show by clear and convincing evidence the hotel's wanton disregard for the safety of sex trafficking victims at their hotel, including the minor D.H.

Super 8 at *supra* 5–14 show there is a jury question as to whether Defendant permitted the rampant illegal conduct constituting the nuisance which injured D.H.

### C.    Punitive Damages and Fees.

The facts cited at *supra* n. 22 create a jury question as to punitive damages and fees. The harm to D.H. was physical, Defendant acted in reckless disregard of her safety by allowing the rampant crime and trafficking at its hotel, the conduct continued at least ten years, and witness testimony shows this was no "mere accident."[19] As such, an award of fees and punitive damages should be for the jury to determine.

## CONCLUSION

Because there are disputed issues of fact as to the elements of D.H.'s claims, Defendant's motion for summary judgment should be denied.

---

[19] "In deciding the amount of punitive damages, courts consider "whether the harm was physical or economic, whether defendants acted with reckless disregard of the victim's health and safety, whether the conduct was repeated, and whether the conduct was a result of malice or deceit as opposed to mere accident." *Arreguin v. Sanchez*, 398 F. Supp. 3d 1314, 1329 (S.D. Ga. 2019).

Respectfully submitted this 8th day of December, 2023.

<div style="margin-left: 40%;">

**ANDERSEN, TATE, and CARR, P.C.**

***/s/ Jonathan S. Tonge***

Patrick J. McDonough
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
Jonathan S. Tonge
Georgia Bar No. 303999
jtonge@atclawfirm.com
*Attorneys for Plaintiff*

</div>

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile

## **CERTIFICATION**

This is to certify that the foregoing Plaintiff's Brief in Support of Response in Opposition to Defendant's Motion for Summary Judgment has been prepared with one of the following font and point selections approved by the court in LR 5.1, NDGA.  Specifically, the above-mentioned pleading was prepared using Times New Roman, 14-point font.

This 8th day of December, 2023.

<div align="right">

**ANDERSEN, TATE, and CARR, P.C.**

**_/s/ Jonathan S. Tonge_**
Patrick J. McDonough
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
Jonathan S. Tonge
Georgia Bar No. 303999
jtonge@atclawfirm.com
_Attorneys for Plaintiff_

</div>

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day I electronically filed the foregoing Plaintiff's Brief in Support of Response in Opposition to Defendant's Motion for Summary Judgment with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the attorneys of record.

Respectfully submitted this 8th day of December, 2023.

**ANDERSEN, TATE, and CARR, P.C.**

*/s/ Jonathan S. Tonge*
Patrick J. McDonough
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
Jonathan S. Tonge
Georgia Bar No. 303999
jtonge@atclawfirm.com
*Attorneys for Plaintiff*

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile