Page 15

1        Q.   Okay.

2        A.   But whatever, it's fine.

3        Q.   A patrol officer or uniformed officer.

4        A.   Yeah.

5        Q.   How often did you have the occasion to

6    respond to this hotel?

7        A.   As a patrol officer, it was my area, so

8    I can't really guess a number.  I was -- I was in

9    that area all the time.

10       Q.   So was there anything that stood out to

11   you that would make you recall responding to this

12   hotel?

13       A.   I can -- I can recall a couple incidents

14   involving drugs, but as a uniformed officer, I

15   wasn't -- I wasn't trained in any special victim,

16   so that's not something that sticks in my mind.

17   It was an area that I worked.

18       Q.   What other -- how would you describe the

19   crime in that area?

20       A.   Around the hotel or --

21       Q.   Yeah.

22       A.   -- just in the precinct?  It was

23   typically drug and prostitution and gang

24   activity.

25       Q.   How often did you respond to that hotel



Page 17

1    most important at the time.  This is an area that

2    I was going to frequent.  It was an area that I

3    was assigned to most frequently, and having the

4    one joint on him versus a large amount of

5    marijuana, at the time, learning the area was

6    more important than arresting someone for a tiny

7    amount of marijuana.

8         Q.  Well, if this was a high-crime

9    activity -- or high-crime area that you describe

10   with drugs --

11        A.  Uh-huh.  (Affirmative).

12        Q.  -- prostitution and gang activity, did

13   you not believe, at the time, that it was

14   important to make arrests for any of those

15   offenses?

16        A.  For marijuana versus the drugs, the

17   cocaine in the white substance is the one that I

18   made an arrest for,  but the marijuana, at the

19   time, was not one that I made an arrest for.

20        Q.  So the cocaine arrest, that was for the

21   first one you described, correct?

22        A.  Yeah, yes.

23        Q.  And what year was this?

24        A.  It would have been between '11 and '15,

25   probably in the '11 year.  Those were -- I'm



Page 18

1    saying that because they're significant to me,

2    and I was a beginning officer.

3         Q.   Okay.  How far is the precinct from this

4    hotel?

5         A.   Less than three miles.

6         Q.   How about gang activity while you were a

7    patrol officer or uniformed officer at this

8    hotel?

9         A.   It was known to be a gang area.  You

10   could see people with different bandannas on the

11   back, but that was not an area that I had any

12   expertise in.

13        Q.   Did you have any training on that?

14        A.   Maybe basic training in the Academy.

15        Q.   So what made you understand that the

16   bandannas had a significance?

17        A.   Just common knowledge from working, from

18   hearing from the gang detectives about things to

19   look for --

20        Q.   And what, if any --

21        A.   -- look for.

22        Q.   -- instructions were you given as a

23   patrol officer as to what you should do?

24        A.   Just mark it.  You could report it to

25   narcotics or to the gang unit.



Page 20

1    get promoted, or you were no longer a uniformed

2    officer?

3        A.   In 2014, I believe.

4        Q.   Okay.  So between 2011 and 2014 what was

5    your basis of knowledge that there was a drug,

6    prostitution and gang activity problem at this

7    hotel?

8        A.   It's just what is taught to you by your

9    supervisors when you're beginning your role as a

10   uniformed officer.  These are where our gangs

11   are.  These are where our VICE Unit is often.

12   You may be asked to assist there.  These are just

13   the types of things that we did as a uniformed

14   officer.

15       Q.   Do you ever recall assisting VICE during

16   this time period at this hotel?

17       A.   I don't recall, but that question is

18   similar to, like, asking what you had for lunch.

19   My call sheet for a day might be, like, 35 -- 35

20   instances a day.  So I don't -- nothing --

21   nothing significant to me stands -- stood out,

22   except for the ones that I shared.

23       Q.   How about the other motels in the area?

24   How close by -- tell me -- identify which hotels

25   are close by to the one we're talking about



Page 21

1    today.

2         A.  I don't know what it's called now, but

3    there used to be a Knights Inn opposite of this

4    location, Super 8, America's Best.  On the other

5    side, there's a Motel 6 -- or was a Motel 6 and a

6    Masters Inn.

7         Q.  Any other ones you can recall?

8         A.  No, I think that's all right there at

9    that intersection.

10        Q.  Were you told the same information about

11   these two other motels about drugs, prostitution

12   and gang activity?

13        A.  Yes.

14        Q.  Were there any other businesses or

15   apartment complexes or residential areas that

16   were also included in a high-crime area

17   description, if you will?

18        A.  In general?

19        Q.  In general.

20        A.  There is an area on Candler Road.  It's

21   not an area that I worked in uniformed, but it's

22   a -- it's just common knowledge in DeKalb there's

23   a lot of crime in the area.  Police have to

24   respond often to that area.  There's another area

25   on Covington Highway.



Page 38

```
 1        A.   Yes.
 2        Q.   Okay.  And how did you become involved
 3   with her investigation?
 4        A.   VICE Unit conducted an operation.  I
 5   believe they responded to an advertisement, and
 6   ended up at -- I don't know if it was Super 8 or
 7   America's Best at the time, I think Super 8.
 8        Q.   And do you recall what year that was?
 9        A.   I don't recall, but it might be my
10   Declaration, if I can look at that.
11        Q.   Yeah, we'll get to your Declaration in a
12   minute --
13        A.   Okay.
14        Q.   -- so we can look at that later.
15        Were you still in this same unit?
16        A.   Yes.
17        Q.   Okay.  And actually before we get to
18   E.M.
19        How long did you stay in that unit?  Well,
20   2015, and then what did you do?
21        A.   I was in the ICAC unit until 2017.
22        Q.   September 2017, I'm sorry.
23        A.   September.
24        Q.   Okay.  And then after that, did you
25   leave that unit, and where did you go?
```



Page 50

1  We've been going for a little bit of time.  We'll

2  take maybe a 10-minute break.  Does that -- does

3  that work, Trinity?

4          MS. HUNDREDMARK:  Yeah, of course.

5          THE VIDEOGRAPHER:  We are now going

6  off the video record.  The time is currently

7  11:56 a.m.

8          (Off-the-record)

9          THE VIDEOGRAPHER:  We are now back on

10  the video record.  The time is currently

11  12:05 p.m.

12  BY MS. GILMORE:

13      Q.  Ms. Gibbs, I want to show you what's

14  been marked as Defendant's Exhibit 1.

15          MS. HUNDREDMARK:  Thanks.

16          MS. GIBSON:  I don't want to throw it

17  at you.

18          MS. HUNDREDMARK:  That's all right.

19  BY MS. GILMORE:

20      Q.  And ask if you can review that and tell

21  me if you've ever seen or reviewed this before.

22          (Defendant's Exhibit 1

23          was marked and identified)

24      A.  Yes, I've seen this before.

25      Q.  Okay.  And is this the -- I guess, the



```
 1   VICE report concerning E.M. and Tremaine Johnson?

 2        A.  Yes.

 3        Q.  All right.  And after review of this,

 4   does it appear that E.M. was in fact arrested for

 5   prostitution?

 6        A.  If I can read the notes that

 7   Detective Johnson -- so at the top of the

 8   Narrative portions of each page, it has the

 9   officer who is writing the report here.

10        So Detective Johnson has an initial

11   Narrative, if I can read that, is that where the

12   arrest was made?

13        Q.  My question to you is, does this refresh

14   your recollection that there was an arrest made

15   for prostitution, and E.M. was arrested for that?

16        A.  Let me read it.

17        Q.  Sure, take your time.

18        A.  Yes, I see in the Narrative that E.M.

19   was arrested.

20        Q.  For prostitution?

21        A.  Yes.

22        Q.  And do you know what happened to those

23   charges?

24        A.  No, I don't.

25        Q.  Okay.  And does this report also refresh
```



Page 52

1    your recollection that E.M. gave a fake date of

2    birth or lied about her age?

3        A.  Yeah, she must have.  On the -- on the

4    face of this sheet it has that she's listed as

5    16, so perhaps that's new information after the

6    detective realized her age.  If she was arrested,

7    it doesn't make sense that he would take her to

8    the -- to the jail.  It had to be because he

9    thought she was older than 18, or 18 -- 17 or

10   older.

11       Q.  And is it your understanding that this

12   investigation was for prostitution and not at the

13   hotel itself, correct?

14       A.  That the investigation was about the

15   hotel, no.

16       Q.  No, not about the hotel.  It was about

17   prostitution, correct?

18       A.  Right, it was about prostitution.

19       Q.  Okay.  And it was the advertisement, I

20   guess, on Backpage that brought them to this

21   hotel; is that correct?

22       A.  Correct.

23       Q.  Okay.  So is it your understanding that

24   the officers learned E.M's correct age and then

25   called you?



1      A.  Yes, that's what it seems like.  The

2  date on the initial report is 6/9/2017.

3      Q.  Okay.

4      A.  There's a case note from Tyner-Edmonson,

5  who's another detective in the ICAC unit, from

6  the same date, and she's explaining whatever

7  information she has at the time, and then my case

8  note is from 6/10, where my involvement with

9  these -- with it on how the transition was made

10  from, oh, maybe VICE made a mistake, too.  Okay,

11  let's try to figure out what's what.

12      Q.  Did you review any of the surveillance

13  video from this hotel from this particular

14  incident?

15      A.  Yes.

16      Q.  Okay.  And when was that?

17      A.  Let's see.

18      Q.  And Ms. Gibbs, I want to show you what's

19  been marked as Defendant's Exhibit 2.  I believe

20  those are your supplemental reports, so that may

21  refresh your --

22      A.  Okay.

23      Q.  -- recollection as well.

24          (Defendant's Exhibit 2

25          was marked and identified)



1      A.  Yeah, thank you.  I reviewed their

2  surveillance on 6/9, so this is when -- on page

3  5, I believe, so we execute the search warrant at

4  the hotel room.  We're typically going to the

5  front desk to see if there's any person that it

6  might be registered -- who the room is registered

7  to, if they have surveillance.

8      All of those questions usually happen at the

9  same time when we respond with the -- with a

10  search warrant.

11      Q.  So do you know how it was that anyone

12  learned of E.M.'s true age?

13      A.  Let's see.  Probably, in this interview

14  with myself and Detective Edmonson.  Let's see.

15  All right, this is 6/9/2017.

16      Q.  Which exhibit are you looking at?

17      A.  I'm looking at the police report.

18  Detective Tyner-Edmonson has a case note.  I sat

19  with this interview -- on this interview with

20  her.

21      Q.  And it's Exhibit 1, correct, Defendant's

22  Exhibit 1?

23      A.  Yes.

24      Q.  And what page are you on?  You can look

25  at the --



1          A.  One-, two --

2          Q.  -- number --

3          A.  -- three --

4          Q.  -- on the bottom.

5          A.  It's page 3133.

6          Q.  Great, okay.

7          A.  So at this time, Detective

8   Tyner-Edmonson is writing in her case report that

9   E.M. is 16 years old, so it would have been

10  during this interview with her.  Let's see.

11          Q.  And then was that the information that

12  was passed on to you?

13          A.  Yes, I believe I sat in on this

14  interview with her.

15          Q.  Would that be reflected in either his

16  report or your report?

17          A.  Probably, somewhere.  Let me see.  I'm

18  sorry, it's been a while since I've seen this.

19  The police report, 3137, my case note at the top,

20  this is case note EMG3093, I sat with Detective

21  Edmondson.  This is during the interview.

22          So it says that I sat with her when she

23  interviewed Mr. Johnson, but I'm pretty sure I

24  sat with her during E.M. as well.  I don't know.

25  Let's see.



1        Q.  So although, it says that --

2        A.   It says, Detective Edmondson interviewed

3   E.M. on 6/9/2017.  I sat with Detective Edmondson

4   when she interviewed Mr. Johnson.

5        Q.   And it looks like the case was

6   reassigned to you on June 13th; is that fair?

7        A.   Officially, but I conducted the search

8   warrant at the hotel.  So I'm just thinking,

9   like, logistically, you have the victim, your

10  interviewing the victim at the -- at the

11  precinct.  If I'm conducting the search warrant

12  and getting the registration for the hotel and

13  then return to the precinct, there's the

14  probability that I was with her.

15       I mean, I remember being with her in the --

16  in the interview, so maybe I didn't finish it all

17  with her, conduct it from the beginning, but then

18  we interviewed Mr. Johnson following that.

19       Q.   And did you learn that E.M. had actually

20  checked into the hotel?

21       A.   If it's written down somewhere.  Let's

22  see.  Let me look at the big notes.  The case

23  file would typically have the registration

24  information in it, so if it's not written here --

25  do you have the case -- the case file?



1        Q.   You have what I have.

2        A.   Okay.  Let me check and see if it's

3   written here.

4        A.   So in the investigation supplemental

5   report --

6        Q.   Can you refer to the exhibit number,

7   please?

8        A.   Yeah, Defendant's Exhibit 2 --

9        Q.   Uh-huh.  (Affirmative).

10       A.   -- on page 613, this says -- it says

11  that Detective Edmondson reported that E.M. told

12  her.  So this sentence at the beginning of the

13  very last paragraph is when she's telling her

14  that she rented a room with an ID card she found.

15       Q.   I'll show you what's marked as

16  Defendant's Exhibit 3.

17       For the purposes of this deposition, do you

18  recognize that as the fake ID that was used for

19  her to check in?

20            (Defendant's Exhibit 3

21            was marked and identified)

22       A.   It does not -- this does not jog my

23  memory.  It's not familiar to me, but if it's in

24  the evidence file --

25       Q.   Okay.



1      A.  -- then this was the ID she had.

2      Q.  And do you recall how she was dressed

3  when you interviewed her?

4      A.  I do not.

5      Q.  I want to show you what's been marked as

6  Defendant's Exhibit 4.

7      Do you recall confiscating that or

8  retrieving that picture of her during your

9  investigation?

10          (Defendant's Exhibit 4

11          was marked and identified)

12     A.  I don't -- I don't remember, but if it's

13  in the file, then this is what we obtained at the

14  time.

15     Q.  Okay.  Do you recognize her?

16     A.  I don't recognize her.

17     Q.  Have you had any contact with her since

18  this case?

19     A.  No.

20     Q.  Do you have any idea what she's doing

21  now?

22     A.  No.

23     Q.  Do you know how long she was at the

24  motel?

25          A.  If it's written somewhere -- let's see.



Page 59

1    Defendant's Exhibit 2, 613 in the last paragraph,

2    she told Detective Edmondson that she had been

3    there for the last two days.  I don't have the

4    hotel registration here --

5        Q.  Now --

6        A.  -- to confirm.

7        Q.  But you did look at the surveillance,

8    correct?

9        A.  Yes.

10       Q.  And did you learn, in fact, that she had

11   checked in with this fake ID?

12       A.  She would not have been able to check in

13   as a juvenile.

14       Q.  Okay.  So did you understand from the

15   hotel staff that she used a fake ID?

16       A.  That she used an ID, yes.

17       Q.  Well, would it have been -- if it

18   reflected her correct age, then she could not

19   have checked in --

20       A.  Right.

21       Q.  -- is that your testimony?

22       A.  Yes.

23       Q.  Okay.  So I believe -- and you can take

24   a look, I know I just asked you how long she was

25   there.



1      It looks like she checked in the afternoon

2  of June 8th of 2017, and then, of course, the

3  police responded on June 17th.  So is it fair to

4  say she was at this police -- or at this hotel

5  for less than 24 hours?

6      A.  June 9th, yes.  June 9th is when the

7  investigation began with VICE.

8      Q.  So are you aware that June -- well, when

9  the VICE officer came on June 9th, was that her

10 first date?

11     A.  If that's -- if that's what the

12 registration shows, then yes.

13     Q.  Okay.  And that would have been on June

14 9th?

15     A.  I don't know that was -- if it was her

16 first date.  Do you mean, like, the first date

17 that she -- like, the first night that she was

18 there, or the first --

19     Q.  Well --

20     A.  -- person who came to her?

21     Q.  The first person that came to her on the

22 9th.

23     A.  I don't think that was her testimony to

24 Detective Edmondson.  I think I saw it here

25 somewhere.



1      Q.  I believe, and correct me if I'm wrong,

2  that she may have said she had five dates on the

3  day before, June 8th.

4      A.  Okay.

5      Q.  And please -- I'm asking you, so please

6  review this.  I mean, this --

7      A.  That's fine.

8      Q.  I understand.  When was the last time

9  you looked at your -- at these reports?

10     A.  I don't know.  It's been a while -- a

11 while.  Let's see.  What was your question?

12     Q.  How many dates did --

13     A.  Dates?  Like, visitors had she had?

14     Q.  -- she have the day before?  Yes, the

15 day before.

16     A.  Let's see.  I don't know where it is.

17 Let's see.  I thought I saw five somewhere, but I

18 don't remember exactly which page it was on.

19     Q.  Yeah.  My recollection was five, but

20 if -- on the day before, which would have been

21 June 8th of 2017, so --

22          MS. HUNDREDMARK:  613, page 613.

23 BY MS. GIBSON:

24     Q.  And I don't recall if that was your

25 exhibit or -- I mean, your report or the initial



1  associated with that case?

2      A.  I believe that was a VICE operation as

3  well, an undercover operation that they

4  conducted, where they responded to an

5  advertisement and located this minor.

6      Q.  So if I told you this occurred -- or the

7  allegations are this occurred in 2015; does that

8  sound --

9      A.  The time period, yes.

10     Q.  Okay.  And do you recall the

11 circumstances of the VICE investigation?

12     A.  Not exactly.  They would have called us

13 because they had a -- someone that they believed

14 to be a minor, had identified as a minor.

15     Q.  And do you know who her trafficker was?

16     A.  She had an older sister who was -- who

17 was arrested.

18     Q.  Okay.  And do you recall the name?

19     A.  No, I don't recall her name.

20     Q.  Okay.  Do you recall --

21     A.  I believe it started with an S.

22     Q.  Okay.

23     A.  There was a D, and there was an S.  I

24 think the sisters were S's.

25     Q.  Tell me what you recall about D.H.



1      A.   She looked -- she looked young.  I

2  remember her demeanor, that she was, like, new to

3  it.  You know, she was doing -- like, when she

4  spoke, she was doing what her sisters told her.

5  Her sisters were teaching her how to do this,

6  that this was her, like, first experience in this

7  type of activity, I mean, the setting up online

8  and having people come to you for sex.

9      Q.   And why is it that you made that

10  conclusion?

11      A.   Because I remember speaking to her and

12  her talking about, like, where she got this from,

13  the fact that she was with her sisters.

14      Q.   And when you testified that she looked

15  young, what did you mean by that?

16      A.   I don't remember exactly what her face

17  looked like, but I remember thinking that she had

18  a baby face, and I remember her -- like, her

19  being tearful when she was just kind of -- like I

20  just -- I don't really -- like, like I don't do,

21  you know, like it's so many.  I just don't know

22  and, like, recognizing that she was a child.

23      Q.   Do you recall how she was dressed?

24      A.   Not exactly.  I think she was in shorts.

25  I say that, because I think she was taller.



Page 67

```
 1        Q.  Do you remember what happened to them?
 2        A.  I know they were charged.  I don't know
 3   what happened to them.
 4        Q.  Okay.  Do you know if she was
 5   cooperative with the investigation -- well, let's
 6   say, the prosecution?
 7        A.  I don't know if she was cooperative with
 8   the prosecution.
 9        Q.  Was she cooperative with you?
10        A.  She was cooperative.  I mean, I don't
11   recall her being friendly or especially outgoing
12   or anything like that.  We got the information we
13   needed to make an arrest.
14        Q.  Do you recall how old she was?
15        A.  She was 15, I believe.
16        Q.  15?
17        A.  Uh-huh.  (Affirmative).
18        Q.  And what happened to her as a result of
19   this investigation?
20        A.  I know she was placed at Wellsprings.  I
21   don't know how long she stayed there.
22   Wellsprings -- well, it's a -- like, a
23   residential facility, so if it's an option, I
24   believe that kids can stay there, unless some
25   other, you know, family member or something like
```



Page 81

```
1          Q.  In your Declaration --
2          A.  Uh-huh.  (Affirmative).
3          Q.  -- you state, and I'm looking
4    specifically at -- well, let's look at paragraph
5    6, please, which is on page 2.
6          A.  Uh-huh.  (Affirmative).
7          Q.  In your Declaration, you stated you
8    investigated numerous sex trafficking cases at
9    the Super 8 and America's Best Value Inn.
10         Tell me again how many cases that was.
11         A.  Overall in DeKalb?
12         Q.  No.  Specifically --
13         A.  Just at that those two?
14         Q.  Yes.
15         A.  I don't know specifically those two.
16   The two that we're here for today were brought to
17   my attention, and I recall things about them.
18   There is, like, one other case that stands out to
19   me.
20         Q.  Okay.  And when you say brought to your
21   attention, who brought those to your attention?
22         A.  The attorneys that represent the
23   victims.
24         Q.  So based on your testimony, is it fair
25   to say that you investigated three sex
```



Page 82

1    trafficking cases at this hotel?

2        A.   That I remember, because they're

3    significant in some way, yes.

4        Q.   Well, if you had investigated them and

5    had written police reports, we should be able to

6    find those, correct?

7        A.   Yeah.

8        Q.   Okay.  So the time frame for these

9    investigations, for at least the three, would

10   have been, what, 2015 until when?

11       A.   September 2017.

12       Q.   Okay.  So number 7, paragraph number 7,

13   you state, the reputation of the hotel and the

14   police department was a motel where commercial

15   sex and traffic and drugs were constant

16   occurrences, and it was a problem area in DeKalb.

17       First of all, were there other areas in

18   DeKalb that you would say also fit as a problem

19   area?

20       A.   Yes.

21       Q.   What other areas?

22       A.   There is an area off Candler Road.

23       Q.   Okay.

24       A.   There's an area near -- off Covington

25   Highway.



1    A.  Yeah, but driving by in an instant is

2    different than, like, being on the property and

3    seeing what's going on at the room.

4    Q.  Well, are you aware of drugs being sold

5    out of hotel rooms there?

6    A.  They could be, sure.

7    Q.  Okay.  Your next paragraph, you say

8    allowing any kind commercial, and specifically

9    12 --

10    A.  Uh-huh.  (Affirmative).

11    Q.  -- allowing any kind of commercial sex

12    on the property runs the risk that a person who

13    is not 18 years old is being sold for sex, and

14    the property is then fostering sex trafficking.

15    What do you base this statement on?

16    A.  This wording is a little funny, but

17    someone under the age of 18.  So with that team,

18    like, frequent visitors being a flag for

19    commercial sex trafficking.  Because it is very

20    clear.

21    The property -- the property managers, the

22    staff who are there are going to be aware of

23    what's going on, and even if they don't know that

24    there is sex happening in the room, they know

25    that this woman is here by herself, you know,



1    where there's a number of people going in and

2    out, or that this woman is here with a male

3    subject who is -- who is in and then out when the

4    visitors come, or in while the visitors come,

5    because they're hiding somewhere else while

6    the -- while the acts happen.

7        But the people who are on the property are

8    going to know.  They're going to know it's

9    happening.  It's that obvious.  They're going to

10   see the number of visitors that are -- that are

11   coming in and out.

12       Q.  And you base this just on what you think

13   they should know or based on --

14       A.  Just because I think it's -- I think it

15   is common for anybody who is working at a

16   location to notice when there is more than normal

17   foot traffic in a particular area.

18       Q.  Did you have any information that there

19   was anyone at the hotel associated with sex

20   trafficking, anybody who --

21       A.  Prior to what?

22       Q.  -- worked or owned or managed between

23   2015 and 2017?

24       A.  Did I have information that anyone at

25   the hotel knew?



Page 93

1      Q.  No.  Anyone was involved in sex

2   trafficking and prostitution, or prostitution, at

3   the hotel?

4      A.  Did I have -- did I have knowledge that

5   there was prostitution --

6      Q.  No.

7      A.  -- at a hotel?  Okay.

8      Q.  Did you have any knowledge that anyone

9   associate with the hotel manager, employee --

10     A.  Right.

11     Q.  -- anyone who worked there was actually

12  involved in sex trafficking?  Leave it at that.

13     A.  So I'm not aware that any staff was

14  having sex with anyone or recruiting anyone at

15  the location, but part of the legal definition

16  is, like, harboring or maintaining somebody, and

17  if they're utilizing the property and are aware

18  that that's happening, and aware I mean like, by

19  the obvious traffic that's coming in and out of

20  the location, then they -- and they can just call

21  911.  It's just that easy.  They don't even have

22  to say anything else, hey, I think something's

23  going on here.

24     Q.  Well, I understand --

25     A.  I don't have any knowledge that they --



1    that they -- that they knew what was going on,

2    but I know, based on the victims and the

3    frequency of dates that they're having at these

4    locations, you know, like the one girl had 15 to

5    20 in a day.  That is going to stand out.  That's

6    going to stand out and be obvious.

7        Q.  But these are two victims that you knew

8    about at this hotel between 2015 --

9        A.  These are two.

10       Q.  -- and 2017, correct?

11       A.  These are two, but if you -- if you can

12   find other ones, then they would -- they might be

13   familiar to me, too.  I remember -- I remember

14   one, because of the circumstances and the guy,

15   and I remember the other, because it was her

16   sisters who were the traffickers.

17       Q.  Okay.

18       A.  So those stand out to me, but the

19   pattern of someone being in a hotel and getting

20   dates and probably having someone else, a pimp or

21   somebody, is like standard, like, this is how

22   it's set up.

23       Q.  And I'm asking you, what your personal

24   knowledge is --

25       A.  Uh-huh.  (Affirmative).



1    research that backs that up or training that you

2    can recall that says just that?

3        A.   No, not that says just that.

4        Q.   Okay.

5        A.   But I have training on the commercial

6    sex aspect and on Georgia law and why -- and it's

7    not so specific and finite.  It's broad in those

8    ways to cover anyone who's going to be, well, I

9    didn't touch her, but I drove her to all the

10   dates, or I didn't -- I didn't touch her, but she

11   always did it at my house.  She always worked at

12   my house.  It's the same thing for these

13   commercial properties.

14        If you can -- if you can see what's going

15   on, you have a responsibility to act, and that's

16   what I'm saying.  If you allow the commercial sex

17   to happen and think, okay, well, it's just adults

18   doing what they want to do, then that's fine, you

19   are creating a space for juveniles to then be

20   victimized if it's a known area that you can do

21   this -- that you can do this.

22        So the training referencing just sex

23   trafficking or commercial sex trade is going to

24   cover the bases of number 12 or wherever you are,

25   and the law is going cover the other aspect, the

